605 S.E.2d 518

**In the Matter of Bamberg County Magistrate Danny J. SINGLETON, Respondent.**

**No. 25894.**

Supreme Court of South Carolina.

Submitted Sept. 24, 2004.

Decided Nov. 8, 2004.

Henry B. Richardson, Jr., of Office of Disciplinary Counsel, and Assistant Deputy Attorney General Robert E. Bogan, both of Columbia, for Office of Disciplinary Counsel.

C. Bradley Hutto, of Orangeburg, for respondent.

PER CURIAM:

In this judicial disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent pursuant to Rule 21, RJDE, Rule 502, SCACR. In the agreement, respondent admits misconduct and consents to any sanction set forth in Rule 7(b), RJDE, Rule 502, SCACR. We accept the agreement and remove respondent from office. The facts as set forth in the agreement are as follows.

## *FACTS*

Respondent adjudicated fourteen traffic tickets issued to close family members and three traffic tickets issued to a friend. With regard to these instances, respondent and ODC agree:

1. Respondent served as the presiding judge on five speeding tickets which had been issued to his father. Respondent adjudicated his father not guilty on each of the

tickets. Notations on three of the tickets indicate the officer or trooper had already reduced the violation to speeding less than ten miles over the speed limit at the time the tickets were issued.

2. Respondent served as the presiding judge on a speeding ticket issued to his mother for speeding 64 in a 55 miles per hour zone. Notations by the officer on this ticket indicate the vehicle was traveling 68 miles per hour, that respondent's mother admitted she thought she was driving 65 miles per hour, and that the ticket was issued for the lesser offense of speeding less than ten miles per hour over the speed limit. Respondent adjudicated his mother not guilty.

3. Respondent served as the presiding judge on a speeding ticket issued to his daughter for speeding 73 in a 55 miles per hour zone. Notations on the ticket indicate respondent's daughter admitted "she was rushing to get home." Respondent adjudicated his daughter not guilty.

4. Respondent served as the presiding judge on two speeding tickets issued to his sister-in-law. "No Help" is written in large letters on the bottom of the earlier ticket. Respondent adjudicated his sister-in-law not guilty on this ticket.

Notations on the "Trial Officer's Copy" of the other ticket indicate respondent's sister-in-law was traveling 70 in a 55 miles per hour zone and that she told the trooper she was inattentive to her speed. The trooper issued the ticket for the lesser offense of speeding 64 miles per hour in a 55 miles per hour zone. The "Drivers Record Copy" of this ticket is marked to indicate that respondent's sister-in-law did not appear for court, was found guilty, and a $50.00 fine was imposed. Approximately ten days later, respondent caused an *Ishmell*[1] order to be issued changing the verdict to not guilty for the following reason: "Defendant had come before the judge prior to court time and had been granted a Not Guilty verdict. This verdict failed to reach proper persons handling court." Three days after the Department of Public Safety acted on the

---

1. *See Ishmell v. South Carolina Hwy. Dept.,* 264 S.C. 340, 215 S.E.2d 201 (1975).

*Ishmell* order, respondent, or someone at his request, entered the notation "NG 3–9–01 DJS" on the "Trial Officer's Copy" of this ticket. Respondent also wrote a note on the back of this ticket stating that the "verdict of the trial should read not guilty."

5. Respondent served as the presiding judge on a speeding ticket issued to his sister for driving 64 in a 55 miles per hour zone. Notations on the ticket indicate she was actually driving 72 miles per hour, that she told the trooper she was not aware of her speed, and that the trooper reduced the charge to speeding less than ten miles per hour over the speed limit at the time the ticket was issued. Respondent adjudicated his sister not guilty.

6. Respondent served as the presiding judge on two tickets issued to another sister. A March 10, 1996, ticket for a seat belt violation was adjudicated guilty. Court records indicate the fine was suspended.

On October 25, 1998, respondent's sister was issued a speeding ticket for driving 64 in a 55 miles per hour zone. The "Trial Officer's Copy" of this ticket bears notations indicating that the car was traveling 68 miles per hour and that the driver told the trooper she "had [her] cruise on 64." Court was set for November 19, 1998. The "Violator's Copy" of this ticket bears a notation at the bottom "Not Guilty per conversation with [the trooper] on 11–18–98" (the day before court was to convene), and respondent's initials. Court records establish that a not guilty verdict was entered on this ticket.

7. Respondent served as the presiding judge on two tickets issued to his brother. On April 4, 1998, respondent's brother was charged with speeding 78 in a 55 miles per hour zone. The ticket was adjudicated not guilty by respondent.

On June 24, 2000, respondent's brother was charged with speeding 64 in a 55 miles per hour zone. Notations on the ticket indicate the car was traveling 70 miles per hour, that the driver said he "was not paying attention," and that the officer issued the ticket for the lesser offense of speeding less than ten miles per hour over the speed limit. Court records establish respondent adjudicated his

brother guilty and imposed a sentence of one day in jail, but suspended the sentence.

8. Respondent served as the presiding judge on three tickets issued to his friend Kenneth C. McMillian. Respondent found McMillian not guilty on one speeding ticket. Two tickets were issued to McMillian on December 6, 2002, one for speeding 83 in a 55 miles per hour zone and the other for no driver's license in possession. Respondent found McMillian guilty of the diver's license violation but suspended the fine. The "Driver's Record Copy" of the speeding ticket indicates McMillian appeared for court and was found guilty of the speeding violation. This disposition is certified as correct by a signature which appears to be respondent's on the "Driver's Record Copy" of the ticket. Later, respondent sought to have an *Ishmell* order issued concerning the ticket but the trooper refused on the ground that the proposed disposition would not be truthful. According to the trooper, McMillian appeared for court and pled guilty to the offense. Respondent, however, contacted the trooper's supervisor who agreed to issuance of an *Ishmell* order. The order subsequently was issued and McMillian's guilty verdict was changed to not guilty. A note handwritten by respondent appears on the back of the ticket stating that the "verdict of trial should read not guilty."

Of the foregoing seventeen tickets issued to respondent's family and friends, respondent rendered a guilty verdict in five instances. He subsequently changed two of the convictions to not guilty by an *Ishmell* order. He issued suspended sentences on the remaining three convictions.

An examination of the thirteen tickets obtained by ODC revealed that the two instances where a finding of guilt was recorded but later nullified by an *Ishmell* order, the "Driver's Records Copy" of the tickets had been marked in the appropriate manner to show the disposition of the matter and the identity of the presiding judge. In all other instances where respondent issued a not guilty verdict for family members, no entry was made in the appropriate area of the "Trial Officer's Copy" of the ticket and no identification of the presiding judge was made on that copy. Instead, the notation "NG" or "Not

Guilty" notation is accompanied by the typewritten initials "DJS" or "djs."

Respondent failed to comply with the financial recordkeeping requirements set forth in the Chief Justice's Order of November 9, 1999, establishing financial recordkeeping standards in magisterial courts. In particular, the order requires that deposits be made "(1) daily; or upon the accumulation of $250.00, whichever occurs least; (2) on each Friday; (3) and for the last working day of the month." Information provided by respondent's office and an analysis of bank records by ODC establish that, on average, respondent made deposits only once a week from 1999 until the present.

The November 9, 1999, order requires deposit slips to include starting and ending receipt numbers. An analysis of deposit ticket exemplars and information received from magistrate's office personnel establish that, from 1999 until the date of the agreement, respondent failed to enter beginning and ending receipt numbers on the deposit tickets for funds deposited into respondent's bank accounts.

The November 9, 1999, order provides that "all funds related to that docket and accompanying documentation must be remitted to the County Treasurer" at the end of each monthly docket period. An analysis of bank records and financial summary reports by ODC established that funds and supporting documentation for respondent's Civil and Criminal accounts were not remitted to the treasurer in accordance with the order.

Specifically, during the eight month period from December 2002 through July 2003,[2] respondent failed to timely submit both monthly reports and funds on eight occasions. In some instances, the submission of funds and reports was months late.

An examination of financial records by ODC revealed that during the eight month review period, funds received by respondent were not remitted to the County Treasurer in accordance with the Court's November 1999 order, leaving

---

2. ODC selected this period for review.

large balances to be carried forward each month in the Civil and Criminal accounts. For the review period of December 2002 through July 2003, the carry forward balance in respondent's Criminal Account ranged from $128,000.00 to $199,000.00 and the carry forward balance in respondent's Civil Account ranged from $7,000.00 to $16,000.00.

Respondent incurred an unexplained cash shortage of $445.00 in December 2001 and allowed this shortage to exist since that time without resolution. Although respondent made a memorandum of the shortage and represents that he reported the shortage to the County Administrator, respondent failed to report the shortage to Court Administration and ODC as required by the November 9, 1999 order.

Respondent permitted his criminal account to incur monthly bank fees and charges which were drawn automatically by the bank from monies held in that account for safekeeping (i.e., bonds, fines). For the eight month period of December 2002 through July 2003, the bank charged approximately $638.00 against the account for analysis fees.

In matters where respondent allowed defendants to make scheduled time payments, he withheld those payments from deposit until full payment of the bond or fine had been received.

## *LAW*

Respondent admits that the conduct set forth above constitutes a violation of the following Canons of the Code of Judicial Conduct, Rule 501, SCACR: Canon 1 (judge shall uphold the integrity and independence of the judiciary); Canon 2(A) (judge shall avoid impropriety and the appearance of impropriety in all activities); Canon 2B (judge shall not allow family or other relationships to influence his judicial conduct or judgment); Canon 3(B)(7) (judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding); Canon 3(C) (judge shall diligently discharge his administrative

responsibilities without bias or prejudice and maintain professional competence in judicial administration); and Canon 3(E) (judge shall disqualify himself in a proceeding in which his impartiality might reasonably be questioned).[3] Respondent agrees he violated the Chief Justice's November 9, 1999, Order.

Respondent also concedes that his misconduct constitutes grounds for discipline under the following provisions of the Rules for Judicial Disciplinary Enforcement, Rule 502, SCACR: Rule 7(a)(1) (it shall be a ground for discipline for a judge to violate the Code of Judicial Conduct); Rule 7(a)(4) (it shall be a ground for discipline for a judge to persistently fail to perform judicial duties or persistently perform judicial duties in an incompetent or neglectful manner); and Rule 7(a)(7) (it shall be a ground for discipline for a judge to willfully violate a valid court order issued by a court of this state).

## CONCLUSION

We accept the Agreement for Discipline by Consent and remove respondent from office.[4] It is therefore ordered that respondent be removed from office as of the date of the filing of this opinion.

**REMOVED.**

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.

---

**3.** Respondent was previously suspended for six months after he violated of some of the same canons. *Matter of Singleton*, 355 S.C. 85, 584 S.E.2d 365 (2003).

**4.** In a recent opinion, the Court publicly reprimanded a magistrate for misconduct similar to that herein. *Matter of O'Kelley*, Op. No. 25871, 361 S.C. 30, 603 S.E.2d 410 (2004). That magistrate, however, had already resigned from office, leaving a public reprimand as the most severe sanction available.